**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ALEX TOTH and GLADYS MARTINEZ-TOTH,** | : | No. 3:23cv1258 |
| Petitioners | : | |
| | : | (Judge Munley) |
| v. | : | |
| | : | |
| **ALEXANDRIA TOTH-LEDESMA and MICHAEL LEDESMA,** | : | |
| Respondents | : | |

····················································································

**<u>MEMORANDUM</u>**

Before the court is a petition (Doc. 1) filed by Alex Toth ("Father") and

Gladys Martinez-Toth ("Mother," collectively "Parents") for the return of their

daughter ▆▆▆▆▆▆▆▆▆▆▆▆▆▆ to the United Mexican

States ("Mexico") pursuant to the Hague Convention on the Civil Aspects of Child

Abduction art. 11, Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89 ("Hague

Convention" or "Convention") and the International Child Abduction Remedies

Act ("ICARA"), 22 U.S.C. §§ 9001 *et seq.*

Respondents Alexandria Toth-Ledesma ("Paternal Grandmother") and

Michael Ledesma ("Paternal Grandfather," collectively "Paternal Grandparents")

oppose the petition. (Doc. 15). ▆▆▆▆ is presently located with Paternal

Grandparents in Monroe County, Pennsylvania within the jurisdiction of the

United States District Court for the Middle District of Pennsylvania.  Paternal

Grandparents assert an affirmative defense to the return of ███████ to Mexico, maintaining that there is a grave risk that her return would expose her to physical or psychological harm.

The court conducted a full evidentiary hearing on June 12, 2024. (See Doc. 37, Hearing Transcript ("H.T"); Docs. 39-1–39-19, Petitioners Exhs; Docs. 40-1–40-17, Respondents Exhs.).  Having reviewed the parties' post-hearing submissions, including their proposed findings of fact and conclusions of law, (Docs. 41-43), and having carefully considered Paternal Grandparents' grave risk assertion in light of the numerous conflicts in the evidence and testimony, this matter is ripe for a decision and the court makes the following findings of fact and conclusions of law:

**Findings of Fact**

    **a. Background**

**1)**    ████████ was born in Puebla, Mexico on ████████ 2020. (Doc. 4-3, Exh. D to Petition, Birth Cert.).

**2)**    Mother was born in Mexico and is a citizen of Mexico. (Docs. 39-2, Marriage Cert. 39-3, Travel Auth.).

**3)**    Father was born in the United States of America ("United States") and is a United States citizen. (Doc. 37, H.T. at 12:8-9).

2

**4)** ▬▬▬ is a Mexican citizen and a United States citizen. (Doc. 39-4, United States Dept. of State Consular Report of Birth Abroad).

**5)** Mother and Father were married on or about February 15, 2020. (39-2, Marriage Cert.).

**6)** Mother and Father have another child, ▬▬▬, two years of age, who is ▬▬▬'s younger sibling. (Doc. 37, H.T. at 12:5-7).

**7)** Father currently resides with Mother and ▬▬▬ in Villahermosa, Tabasco, Mexico. (Id. at 11:10-12:4).

**8)** Mother, Father, and ▬▬▬ share the residence with other family members, ▬▬▬'s maternal grandmother Gladys Martinez ("Maternal Grandmother"), as well as ▬▬▬'s uncle and cousin. (Id.)

**9)** Father has resided in Mexico since 2016. (Id. at 12:10-12).

**10)** Paternal Grandmother and Paternal Grandfather reside in Kunkletown, Monroe County, Pennsylvania. (Id. at 123:22-23).

**11)** Paternal Grandmother works for the United Nations in finance and human resources relative to peacekeeping missions. (Id. at 151:18-21).

**12)** Mother works as a graphic artist. (Id. at 91:18-92:1).

**13)** Father was unemployed at the time of the hearing. (Id. at 12:15-16).

3

**14)**    He previously provided remote marketing services to small businesses located in the United States and other English-speaking countries. (Id. at 19:20-24).

**15)**    Father speaks Spanish and English. (See id. at 19:24-20:7).

**16)**    Mother and Maternal Grandmother speak Spanish and are not fluent in English. (Id. at 89, 120:10-13).

**17)**    Paternal Grandmother does not speak Spanish. (Id. at 167:21-25).

**18)**    Paternal Grandfather speaks Spanish. (Id. at 168:1-5).

### b. Paternal Grandparents' First Visit to Mexico

**19)**    Paternal Grandparents visited Mother, Father, and ▇▇▇ in Tabasco, Mexico in September 2021 over a seven-day period. (Id. at 128:2-3, 150:5-11).

**20)**    Paternal Grandmother testified that, during that trip, she observed "constant drug use [and] drug paraphernalia all over the place[,]" including use by Father, Mother, and ▇▇▇'s uncle. (Id. at 128:4-14, 146:19-6).

**21)**    ▇▇▇ would have been approximately eleven (11) months old at that time.

**22)**    Mother would have been pregnant with ▇▇▇'s sibling ▇▇▇ at that time.

4

**23)**   Despite such testimony, Paternal Grandparents did not report Parents' drug use to Mexican authorities or to child protective services agencies in Mexico. (Id. at 151:12-15).

**24)**   If there was a question regarding ████████'s safety during that visit, Paternal Grandparents did not intervene.

### c. Father's Criminal Charges in Mexico

**25)**   In February 2022, Mother, Father, and ████████ visited a store in Villahermosa, Mexico. (Id. at 34:18-36-3, 54:17-24).

**26)**   Per Father, a security officer at the store aggressively requested that ████████ wear a mask, Father refused, and the officer denied their entrance to the store. (Id. at 34:18-36-3).

**27)**   Father testified that he questioned the security officer's gender. (Id.)

**28)**   Father reengaged the officer to ask if the officer was male or female. (Id.)

**29)**   The security officer used pepper spray on Father upon such questioning. (Id.)

**30)**   Father responded by punching the security officer in the face. (Id.)

**31)**   ████████ was nearby with Mother when the altercation occurred per Father's testimony. (Id.)

**32)**   Mexican authorities arrested Father and he spent three weeks in jail according to his testimony. (Id. at 55:25-56:3).

5

**33)**   Per Paternal Grandmother, ▇▇▇▇ was born while Father was in prison. (Id. at 149:9-14).

**34)**   Paternal Grandmother testified that Father fled to Puebla, Mexico rather than face the charges. (Id. at 124:2-20).

**35)**   Per Paternal Grandmother, Mother and Father (and presumably ▇▇▇▇ and ▇▇▇▇) were hiding from Mexican authorities in a small apartment at that time. (Id. at 124:21-23).

**36)**   Paternal Grandparents did not travel to Mexico immediately following Father's incident with the security officer.

**37)**   ▇▇▇▇ would have been approximately seventeen (17) months old at the time of the incident.

**38)**   Ultimately, per his testimony, Father's criminal matter in Mexico resolved when Father agreed to pay the security guard reparations through Mexico's restorative justice laws. (Id. at 35:18-22).

**39)**   Father proffered a document indicating that he does not have a criminal record in Mexico. (Doc. 39-12).

**d. Paternal Grandparents Bring** ▇▇▇▇ **to the United States**

**40)**   Per Father, he kept in touch with Paternal Grandmother through frequent video calls. (Doc. 37, H.T. at 25:20-26:4).

**41)** Paternal Grandmother also testified that she was frequently in contact with Father after the incident with the security officer occurred. (Id. at 125:1-6).

**42)** Text messages proffered by the respondents confirm such regular communication between Father and Paternal Grandmother in May 2022. (Doc. 40-5).

**43)** Such messages reflect a closeness between Father and Paternal Grandmother. (Id.)

**44)** If Father was fleeing criminal charges in Mexico at that time, Paternal Grandmother assisted Father financially per the text messages. (Id.)

**45)** According to Father, Paternal Grandmother requested that ▉▉▉▉ come to the United States for a vacation. (Doc. 37, H.T. at 25:23-26:15).

**46)** Per Father, he agreed that ▉▉▉▉ could visit Paternal Grandmother for several months as ▉▉▉▉ approached her second birthday. (Id. at 26:5-19).

**47)** Paternal Grandmother testified that Father called her to pick up ▉▉▉▉ and her sibling ▉▉▉▉ to take them to the United States because Father planned to return there with Mother. (Id. at 124:21-23).

**48)** Regardless of the specific reason, Mother and Father executed a document on September 2, 2022 permitting ▉▉▉▉ to travel from Mexico to the United States to reside with Paternal Grandmother in Kunkletown, Pennsylvania and be under her care for one (1) year. (Doc. 39-3).

7

**49)**   The document permitted Paternal Grandmother to travel with ███ from September 15, 2022 to September 30, 2023. (Id.)

**50)**   Father testified that the intent of the document was not to grant Paternal Grandparents sole legal and physical custody; rather, Mother and Father executed the document to comply with the requirements of the airline. (Doc. 37, H.T. at 30:10-15).

**51)**   The length of the authorization reflected prohibitive costs of transportation and Paternal Grandmother's work schedule according to Father's testimony. (Id. at 26:16-21).

**52)**   The parties exchanged ███ in Puebla, Mexico on September 15, 2022 at a hotel. (Id. at 32:23-33:1, 94:16-19).

**53)**   Paternal Grandparents were provided ███'s birth certificate and passport to travel to the United States. (Id. at 49:5-8).

**54)**   Per Mother, ███'s sibling ███ was several months old at the time of the transfer. (Id. at 94:4-5).

**55)**   Paternal Grandmother did not request that ███ travel to the United States. (Id. at 93:24-94:10).

### e. Child Abuse Allegations

**56)**   Paternal Grandmother testified that ███ required hospital treatment upon their arrival in Pennsylvania. (Id. at 134:1-10).

**57)**   Per Paternal Grandmother, ▓▓▓▓ was sick and covered in cuts, bruises, and scars. (Id.)

**58)**   Paternal Grandmother's testimony about ▓▓▓▓'s condition was not corroborated with photographs or medical evidence. (Id. at 149:20-150:4).

**59)**   Paternal Grandparents have offered undated text messages from Father indicating that, at a minimum, he used corporal punishment or physical discipline with ▓▓▓▓. (Doc. 40-6).

   **f.  Requests for the Return of** ▓▓▓▓

**60)**   Father testified that the parties had a verbal agreement to maintain video call communication with ▓▓▓▓. (Id. at 30:16-31:2).

**61)**   Per his testimony, Father has not been permitted to communicate with ▓▓▓▓ since the child was brought to the United States. (Id. at 31:3-8).

**62)**   Although he testified that text messages to Paternal Grandmother were fabricated, (Id. at 62:5-8), Father sent a message on October 14, 2022, threatening to kill Paternal Grandmother if ▓▓▓▓ was not returned, (Doc. 40-13 at 1-3).

**63)**   Per her testimony, Mother continued to communicate with Paternal Grandmother through video calls. (Id. at 96:15-21).

**64)**   Per Mother, she began frequently requesting ▓▓▓▓'s return at the end of October 2022. (Id. at 96:22-97:1).

9

**65)**   According to Mother, once Mother requested the return of ███████,
Paternal Grandmother called less often and began behaving strangely. (Id. at
97:2-15).

**66)**   Paternal Grandmother offered to help Mother obtain a visa to travel to the
United States, and, at some point, Paternal Grandmother told Mother that
Paternal Grandmother needed custody of ███████. (Id. at 97:18-98:5).

**67)**   In text messages proffered by the Parents, Mother asked Paternal
Grandmother to return ███████ on December 30, 2022, when Paternal
Grandmother indicated that she would not provide Paternal Grandparents' home
address for Mother to obtain a visa. (Doc. 39-18, p. 5).

**68)**   Mother also requested that Paternal Grandparents pay for her plane ticket
to the United States in December 2022. (Doc. 37, H.T. at 103:10-14).

**69)**   Paternal Grandparents apparently refused, and Mother told them that
Father would come to the United States to pick up ███████. (Id.).

**70)**   According to Paternal Grandmother, Father consulted with a family law
attorney in Monroe County, Pennsylvania regarding custody of ███████. (Id. at
142:19-143:10; 156:12-156:21, 171:7-13).

**71)**   Paternal Grandparents knew Father sought advice of counsel regarding
custody of ███████ as early as December 5, 2022. (Doc. 40-16, ECF pp. 16, 40

10

(listing an attorney for Father for service of an emergency order entered pursuant to Pennsylvania Protection from Abuse Act ("PFA Act"))).

**72)**   Mother opened an investigation with authorities in Tabasco, Mexico on January 26, 2023, relative to child abduction and illegal holding, naming Paternal Grandparents as the perpetrators of the offenses. (Doc. 39-6).

**73)**   On November 13, 2023, a judge in Tabasco, Mexico entered an order for the location and presentation of ███████ by Mexican authorities. (Id.)

### g. Domestic Violence Allegations

**74)**   Paternal Grandmother testified that the day after bringing ███████ to the United States in September 2022, she observed Mother with black eyes, cuts, and a busted lip during a video call. (Doc. 37, H.T. at 134:21-25).

**75)**   Per Paternal Grandmother, Father assaulted Mother and Mother separated from Father. (Id. at 135:1-2, 147:7-12).

**76)**   Paternal Grandmother also testified that Mother fled from Puebla to Tabasco and Maternal Grandmother brought Mother to another town to stay with other family members due to threats from Father. (Id. at 147:10-22).

**77)**   Mother denied physical abuse by Father. (Id. at 90:6-9).

**78)**   Father denied striking Mother. (Id. at 59:24-60:18).

**79)**   Mother denied separating from Father other than when he was incarcerated. (Id. at 90:1-5).

**80)**   Father denied separating from Mother. (Id. at 61:2-9).

**81)**   Maternal Grandmother testified consistently with Father and Mother. (Id. at 119:2-12).

**82)**   Paternal Grandmother also testified about previous instances where Father struck and injured romantic partners in 2003 and 2014/2015. (Id. at 141:10-18).

**83)**   Per his testimony, Father was charged with assault in the third degree in 2003 and served two years in a New York prison after pleading guilty to intimidation of a victim or witness. (Id. at 58:20-21).

### h. Monroe County PFA Act and Child Custody Proceedings

**84)**   On December 5, 2022, Paternal Grandparents each filed a petition for relief under Pennsylvania's PFA Act, 23 PA. CONS. STAT. § 6101, *et seq*. with the Monroe County Court of Common Pleas. (Doc. 40-16).

**85)**   The petitions cite text messages from Father threatening to kill Paternal Grandparents. (Id.)

**86)**   On December 5, 2022, a judge in Monroe County granted Paternal Grandparents temporary relief. (Id.)

**87)**   Continued temporary orders were issued on December 12, 2022, February 6, 2023, and March 6, 2023. (Id.)

**88)**   The temporary orders preclude Father from having any contact with Paternal Grandparents. (Id.)

**89)** ███████ is not listed as a protected party on any PFA order issued by the Monroe County Court of Common Pleas in the orders supplied by the respondents. (Id.)

**90)** Thus, there is no state court PFA order in place that has been presented here precluding contact between Father and ████ or Mother and ████.

**91)** Paternal Grandparents also filed a complaint in custody in the Monroe County Court of Common Pleas on January 9, 2023. (Docs. 39-8, 40-15).

**92)** The Monroe County custody action is stayed pending resolution of this petition.

### i. Father's Criminal Charges in Monroe County

**93)** Upon notice of the custody action, Father returned to the United States on January 29, 2023 to retrieve ████. (Doc. 37, H.T. at 38:25-39:9, 61:2-5).

**94)** A Monroe County judge scheduled a custody conciliation conference for February 21, 2023. (Doc. 40-15, Order).

**95)** Although the conciliation conference was conducted using video conferencing software, Father traveled to the Monroe County Courthouse to file documents with the office of the prothonotary on that date. (Doc. 37, H.T. 41:3-10).

**96)** After the conciliation conference, Father walked by the office of Paternal Grandparents' custody lawyer. (Id. at 67:7-68:11).

**97)**   Father testified that he entered the office and began looking in rooms for Paternal Grandparents' custody lawyer. (Id.)

**98)**   An individual confronted Father at the office. (Id.)

**99)**   As Father left the office, he kicked a glass door, which shattered. (Id.)

**100)**  As a result of the incident at Paternal Grandparents' lawyers' office, the Monroe County District Attorneys' office filed a criminal information against Father with five counts: 1) retaliation against a witness or victim, in violation of 18 PA. CONS. STAT. § 4953(a); 2) criminal mischief, in violation of 18 PA. CONS. STAT. § 3304(a)(1); 3) terroristic threats, in violation of 18 PA. CONS. STAT. § 2706(a)(3); 4) simple assault, in violation of 18 PA. CONS. STAT. § 2701(a)(3); and 5) stalking with the intent to cause fear, in violation of 18 PA. CONS. STAT. § 2709.1(a)(2). (Doc. 40-17, Monroe Cnty. Crim. Recs.).

**101)**  On February 24, 2023, the Pennsylvania State Police also filed charges against Father for terroristic threats, in violation of 18 PA. CONS. STAT. § 2706(a)(1). (Id.)

**102)**  This terroristic threats charge stemmed from allegations that Father threatened to kill Paternal Grandparents in text messages from October 14, 2022 to February 21, 2023. (Id.)

14

**103)** Father was incarcerated in the Monroe County Prison from approximately the time of the custody conference until September 26, 2023. (Doc. 37, H.T. at 52:6-9).

**104)** Father then traveled back to Mexico. (Id. at 54:10-12).

**105)** Father failed to appear at a criminal hearing in Monroe County, Pennsylvania on November 8, 2023. (Doc. 40-17, Monroe Cnty. Crim. Recs.).

**106)** A judge in Monroe County issued bench warrants upon Father's failure to appear at the hearing. (Id.)

**107)** Father's recent application for a United States passport was denied based on Father's outstanding warrants in Monroe County. (Doc. 39-13).

### j. Credibility Determinations and Conflicts Between the Testimony and the Text Messages

**108)** The testimony of all witnesses lacked credibility in varying degrees.

**109)** Father's testimony was the least credible.

**110)** Paternal Grandmother's testimony was also not fully credible.

**111)** All text messages offered by the parties as exhibits were admitted into evidence and petitioners' objections to respondent's exhibits were overruled. (Doc. 37, H.T. at 176:5-12, Docs. 39-16, 39-17, 40-2 to 40-9, 40-11 to 40-13).

**112)** Based on the totality of the circumstances, the court concludes that the text messages reflect actual communications between Father and Paternal Grandmother and Mother and Paternal Grandmother at various points in time.

15

**113)**  While the court will discuss evidence from these messages in more detail regarding Paternal Grandparents' grave risk defense, these messages cut both ways.

**114)**  Communications between Mother and Paternal Grandmother reflect that Paternal Grandmother has engaged in a pattern of conduct designed to isolate ████████ from her parents and prevail in a best interests custody determination in the United States. (Doc. 39-15, Email to Mother; Doc. 39-16, Text Messages).

**115)**  Setting Father and his conduct aside, such communications also reflect unilateral efforts by Paternal Grandmother to limit or restrict Mother's contact with ████████, particularly when Mother asserts herself or indicates her alignment with Father. (Id.)

**116)**  Paternal Grandmother has refused to facilitate contact between Mother and ████████ on numerous occasions and withheld information about ████████'s medical treatment.  (Id.)

### 1. Father's Violent Episodes

**117)**  The court gives no weight to Father's explanations about two violent episodes during ████████'s lifetime, i.e., the physical altercation with a security officer in Mexico and the incident at Paternal Grandparents' lawyer's office after custody proceedings in Monroe County, Pennsylvania. (See Doc. 37, H.T. at 34:14-35:17, 83:7-84:21 (explaining that he reengaged with the guard to question

her gender after being ejected from a business for failing to follow that business's COVID-19 protocol and that he punched the guard in the face after she pepper sprayed him in response to that question) 67:7-68-11 (explaining that he broke the glass door and sustained a serious wound to his leg because he was accustomed to opening doors with his feet and he kicked this particular door "a little too hard.").

**118)**  Messages from Mother to Paternal Grandmother dated September 2022 bolster Paternal Grandmother's testimony about Father's abuse of Mother and Mother's efforts to flee domestic violence in September 2022. (Doc. 40-4).

**119)**  The court, however, cannot parse out whether Mother's messages to Paternal Grandmother about threats and physical abuse by Father fully reflect the actual circumstances or were sent by Mother for another reason, such as to have Paternal Grandmother aid in a reconciliation, obtain attention, or get Paternal Grandmother to help with a visa for travel to the United States.

**120)**  No photographs of alleged injuries to Mother in September 2022 were submitted for consideration.

### 2. Mother and Father's Use of Drugs and Controlled Substances

**121)**  Where testimony conflicted about Father's past use of marijuana, cocaine, methamphetamine, psilocybin mushrooms, and LSD, the court resolved such conflicts against Father based on the absolute denials during his testimony. (See

e.g. 64:15-18 ("I have not used drugs my entire life. The only time I have ever been drugged was in a mental hospital when I was an adolescent, so I have not used drugs, I don't use drugs.").

**122)**  The court specifically finds that all the text messages about past drug use attributed to Father as offered by Paternal Grandmother are his actual communications despite Father's poorly executed attempts to disclaim those messages in his testimony. (See 65:1-24 (attempting to attribute statements about LSD in the text messages to Steve Jobs in the context of cross-examination before immediately being confronted with his other texts to Paternal Grandmother about Jobs's positions on LSD)).

**123)**  The court thus gives Father's testimony about his past drug use no weight.

**124)**  The court also gives no weight to Mother and Maternal Grandmother's testimony about Father's past drug use based on their interest in the outcome of such a determination as part of these proceedings.

**125)**  Paternal Grandmother's in-person observations about Father's drug use during ██████'s lifetime are limited to a one-week period in September 2021 and a three-day period in September 2022.

**126)**  Text messages from Father about his drug use end in September 2022.

**127)**  As with Mother's texts about abuse, the court cannot determine whether the messages from Father to Paternal Grandmother about drugs fully reflect

18

actual circumstances or whether they were sent for some other reason, including for the purposes of obtaining Paternal Grandmother's attention.

**128)** The court gives no weight to a photograph from text messages between Father and Paternal Grandmother dated October 8, 2021 purporting to show Mother smoking marijuana while holding ███████. (Doc. 40-2).

**129)** The photograph depicts Mother holding ███████ in her left arm and a long, thin object in her right hand, but the object is not fully apparent in the photograph. (<u>Id.</u>)

**130)** On the other hand, text messages beneath the photograph of Mother and ███████ indicate that Father bragged to Paternal Grandmother about giving ███████ "a shooty" of hydroponic marijuana every day. (<u>Id.</u>)

**131)** The court gives full weight to Father's admissions in the text messages about providing ███████ marijuana in the past.

**132)** The court, however, does not give any weight to Paternal Grandmother's testimony about Mother's drug use.

**133)** Paternal Grandmother testified that she observed Mother using drugs during a visit to Mexico in September 2021.

**134)** Mother would have been pregnant with ███████ at that time.

**135)** If ███████'s safety was at risk, Paternal Grandparents did not intervene while in Mexico in either 2021 or 2022.

19

**136)** Paternal Grandparents also did not bring ▮▮▮ to the United States with ▮▮▮ in September 2022.

### 3. Physical Abuse of ▮▮▮

**137)** Respondents did not provide any photographs or medical evidence corroborating Paternal Grandmother's testimony that ▮▮▮ was sick, needed hospital treatment, and had cuts, bruises, and scars about her body when she arrived in the United States.

**138)** There is no expert testimony in this case from a treating provider that ▮▮▮ was abused.

**139)** Paternal Grandparents did not report alleged abuse to child protective services agencies in the United States or in Mexico.

**140)** At most, text messages from Father to Paternal Grandmother reflect that he used physical discipline with ▮▮▮.

**141)** Those messages do not establish whether physical discipline was used on a regular basis.

**142)** Paternal Grandmother's text messages to Mother dated April and May 2023 about Father's alleged abuse of ▮▮▮ are themselves accusatory and inflammatory and are reflective of a person who wants to maintain control of ▮▮▮'s life moving forward.

**143)** Accordingly, the court cannot give weight to testimony by Paternal

Grandmother that Father physically abused ███████ .

## Conclusions of Law

### a. Jurisdiction

**1)**      This court has jurisdiction pursuant to 28 U.S.C. § 1331 ("The district courts

shall have original jurisdiction of all civil actions arising under…treaties of the

United States." and 22 U.S.C. § 9003(a)("The courts of the States and the United

States district courts shall have concurrent original jurisdiction of actions arising

under the Convention.").

### b. Legal Standard

**2)**      The objectives of the Hague Convention are: 1) "to secure the prompt

return of children wrongfully removed to or retained in" a nation-state that is a

signatory of the treaty; and 2) "to ensure that rights of custody and access under

the law of one" signatory nation-state is "effectively respective" in the other

signatory nation-states. Hague Convention, art. 1.

**3)**      The Hague Convention was not designed to resolve international custody

disputes; rather the Convention was designed to restore the status quo prior to

any wrongful removal or wrongful retention. See Tsai-Yi Yang v. Fu-Chiang Tsui,

499 F.3d 259, 270 (3d Cir. 2007)(citation omitted).

**4)**     The Hague Convention provides that the "removal or the retention of a child is to be considered wrongful" when: 1) '"it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention[;]" and 2) "at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention." Hague Convention, art. 3.

**5)**     "Where a child has been wrongfully removed or retained in terms of Article 3" and less than one year has elapsed from the date of wrongful retention at the time proceedings to return are commenced, "the authority concerned shall order the return of the child forthwith." Hague Convention, art. 12.

**6)**     Under the Hague Convention and the implementing statute, ICARA, the burden is on Mother and Father as petitioners to establish by a preponderance of the evidence that ███████ has been wrongfully removed or retained within the meaning of the Hague Convention. 22 U.S.C. § 9003(e)(1)(A).

**7)**     "Wrongful removal or retention claims under Article 3 of the Convention typically raise four questions: (1) When did the removal or retention at issue take place? (2) Immediately prior to the removal or retention, in which state was the child habitually resident? (3) Did the removal or retention breach the rights of custody attributed to the petitioner under the law of the habitual residence?

22

(4) Was the petitioner exercising those rights at the time of the removal or retention?" <u>Karkkainen v. Kovalchuk</u>, 445 F.3d 280, 287 (3d Cir. 2006).

**8)**    Put more simply, "the Convention ordinarily requires the prompt return of a child wrongfully removed or retained away from the country in which she habitually resides." <u>Monasky v. Taglieri</u>, 589 U.S. 68, 72 (2020)(citation omitted).

**9)**    A "prime" exception to that command is if "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention, art. 13(b); <u>see also</u> <u>Monasky</u>, 589 U.S. at 72.

**10)**    In asserting the grave risk exception to a return pursuant to Article 13(b), Paternal Grandparents must establish by clear and convincing evidence that the exception applies. 22 U.S.C. § 9003(e)(1)(A); <u>see also</u> 22 U.S.C. § 9001(a)("Children who are wrongfully removed or retained within the meaning of the Convention are to be promptly returned unless one of the narrow exceptions set forth in the Convention applies.").

### c. Date of Retention

**11)**    Mother and Father expressly authorized ▮▮▮▮▮▮'s removal from Mexico to travel with Paternal Grandparents and reside in their home from September 15, 2022 to September 30, 2023.

**12)**    Thus, this matter involves retention and not removal.

23

**13)**   A retention is a singular event, not a continuing act. See Marks on Behalf of
SM v. Hochhauser, 876 F.3d 416, 421 (2d Cir. 2017); see also Karkkainen, 445
F.3d at 290 (assuming that a child is not retained until a parent unequivocally
communicates his or her desire to regain custody and setting aside a
determination of the district court of the date that retention occurred).

**14)**   Father unequivocally revoked whatever consent he provided to Paternal
Grandparents on October 14, 2022 when Father threatened to kill Paternal
Grandmother if ▮▮▮▮ was not returned. (Doc. 40-13).

**15)**   Although Mother asked Paternal Grandmother to return ▮▮▮▮ on
December 30, 2022, when Paternal Grandmother indicated that she would not
provide Paternal Grandparents' home address for Mother to obtain a visa, (Doc.
39-18, p. 5), Mother did not unequivocally revoke consent until January 26, 2023
when she opened an investigation into child abduction of ▮▮▮ with Mexican
authorities, (Doc. 39-6).

### d. Habitual Residence

**16)**   A child's "habitual residence" is defined in "fact-focused terms: the family
and social environment in which the child's life has developed." Monasky, 589
U.S. at 77 (citation, internal quotation marks, and brackets removed).

**17)**   A child's residence is "habitual" where there is "some degree of integration
by the child in a social and family environment." Id. (citation omitted).

24

18) "The place where a child is at home, at the time of removal or retention, ranks as the child's habitual residence." Id. (citing Karkkainen v. Kovalchuk, 445 F.3d 280, 291 (3d Cir. 2006)).

19) "[C]hildren, especially those too young or otherwise unable to acclimate, depend on their parents as caregivers, [and] the intentions and circumstances of caregiving parents are relevant considerations." Id. at 78.

20) "Determination of a child's habitual residence immediately before the alleged wrongful removal or retention is. . .a threshold question in deciding a case under the Hague Convention." Karkkainen, 445 F.3d at 287 (citing Feder v. Evans–Feder, 63 F.3d 217, 222 (3d Cir. 1995)).

21) "[A] child's habitual residence is the place where he or she has been physically present for an amount of time sufficient for acclimatization and which has a degree of settled purpose from the child's perspective." Id. at 291–92.

22) A child can only have one habitual residence. See Didon v. Castillo, 838 F.3d 313, 326 (3d Cir. 2016).

23) ███████ was born in Mexico and her life developed in Mexico until shortly before her second birthday.

24) Prior to being brought to the United States, she spent approximately one week of her life with Paternal Grandparents; otherwise, she was dependent on

the care of Mother and Father with supplemental care provided by maternal family members.

**25)** ███████ was present in the United States for approximately thirty (30) days when Father demanded her return to Mexico.

**26)** ███████ was only in the United States for approximately four (4) months when Mother pursued criminal charges in Mexico against Paternal Grandparents for child abduction.

**27)** ███████, now three (3) years of age, is too young to possess any intent regarding her habitual residence.

**28)** Any purported intent would be subject to concerns of undue influence by Paternal Grandparents.

**29)** At best, there is a suggestion from the record that ███████ is enrolled in a preschool or a prekindergarten in the United States.

**30)** Respondents provided no other evidence that ███████ has acclimatized to Monroe County, Pennsylvania or has otherwise settled in the United States.

**31)** Although there was some reference in the testimony and exhibits to Mother and Father potentially relocating to the United States with ███████ while ███████ was with Paternal Grandparents, no substantial steps were taken to effectuate such a relocation.

**32)**   Rather, Father traveled to the United States for the purposes of ████'s return to Mexico.

**33)**   Mother did not ultimately obtain a visa to enter the United States.

**34)**   Accordingly, Mother and Father demonstrated that Mexico is ████'s habitual residence.

**35)**   Mexico contains thirty-one (31) states and an autonomous capital city, Mexico City.

**36)**   ████ lived in both the States of Puebla and Tabasco.

**37)**   The record reflects that ████ only resided in the State of Puebla for temporary periods; otherwise, she resided in the State of Tabasco with Mother, Father, and maternal family members.

**38)**   Mother and Father testified that they resided in the State of Tabasco before the time of the evidentiary hearing and were residing with maternal family members.

**39)**   Thus, the court concludes that the habitual residence of ████ is specifically the State of Tabasco.

### e. Whether ████ Was Wrongfully Retained

**40)**   As noted above, retention is considered wrongful under Article 3 of the Hague Convention when: 1) "it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of

the State in which the child was habitually resident immediately before the removal or retention[;]" and 2) "at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention."  Hague Convention, art. 3.

**41)**   "Custody rights, under the Hague Convention, 'include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence.' " <u>Tsai-Yi Yang</u>, 499 F.3d at 275 (quoting Hague Convention, art. 5(a)).

**42)**   To make a custody determination, it is necessary to carefully examine the country of origin's custody laws to determine whether the party seeking the child's return had custody rights in that country at the time the child was retained. <u>Id.</u> (citation omitted).

**43)**   "When the country in which the child habitually resides has 'more than one territorial unit, the custody rights laws of the territorial unit apply.' " <u>Id.</u> (citing <u>Feder</u>, 63 F.3d at 221–22; Hague Convention, art. 31).

**44)**   The laws of the State of Tabasco thus govern the determination of custody rights.

**45)**   "That poses its own difficulties for a court of the United States, a court which comes from a different legal tradition[,]" and "[c]are must be taken to avoid

imposing American legal concepts onto another legal culture." <u>Whallon v. Lynn</u>, 230 F.3d 450, 456 (1st Cir. 2000).

**46)**   Mother and Father provided a certified, translated copy of the Civil Code for the State of Tabasco, specifically Articles 281-283 and Articles 417-418.[1] (Doc. 39-7).

**47)**   The translated Article 418 provides that "non-emancipated minor children are under parental authority/responsibility (*patria potestas*)[.]" [2]  (<u>Id.</u>)

**48)**   Accordingly, Mother and Father both enjoyed *patria potestas* rights regarding ████ at the time of her retention.

**49)**   Additionally, Mother and Father demonstrated that they would have exercised their custody rights jointly or alone absent retention by the Paternal Grandparents.

**50)**   The document executed by the parties regarding ████ does not confer custody to Paternal Grandparents; it is a travel authorization. (<u>See</u> Doc. 39-3).

**51)**   Consequently, Mother and Father demonstrated by a preponderance of the evidence that ████ was wrongfully retained from her habitual residence.

---

[1] <u>See also</u> *Código Civil para el Estado de Tabasco*, https://tsj-tabasco.gob.mx/docs/14469/codigo-civil-para-el-estado-de-tabasco-pdf2023-pdf/ (last accessed July 24, 2024)(in Spanish).

[2] <u>See also</u> <u>Garcia v. Pinelo</u>, 808 F.3d 1158, 1164 (7th Cir. 2015)(explaining the concept of *patria potestas* in Mexican law as it evolved from the Roman civil law tradition).

**f.  Whether ▮▮▮▮▮s Return Poses a Grave Risk**

**52)**  "After a petitioner demonstrates wrongful removal or retention, the burden shifts to the respondent to prove an affirmative defense against the return of the child to the country of habitual residence." <u>Karkkainen,</u> 445 F.3d at 288.

**53)**  "These affirmative defenses are narrowly construed to effectuate the purposes of the Convention and, even where a defense applies, the court has the discretion to order the child's return." <u>Id.</u> (citing <u>Feder</u>, 63 F.3d at 226)(further citation omitted); <u>see also</u> <u>Tsai-Yi Yang</u>, 499 F.3d at 278 ("[E]ven if the respondent meets his or her burden of proving the affirmative defense, the court retains the discretion to order the return of the child if it would further the aim of the Convention which is to provide for the return of a wrongfully removed child.") (citations and internal quotation marks omitted).

**54)**  The grave risk affirmative defense requires the respondents to prove "that a grave risk that the child's return would expose him or her to physical or psychological harm or otherwise place the child in an intolerable situation by clear and convincing evidence[.]" <u>Karpenko v. Leendertz</u>, 619 F.3d 259, 263 n. 3 (3d Cir. 2010); <u>see also</u> Hague Convention, art. 13(b); 22 U.S.C. § 9003(e)(1)(A).

**55)**  "[A] grave risk of harm exception encompasses 'situations in which the child faces a real risk of being hurt, physically or psychologically, as a result of repatriation,' but not 'situations where repatriation might cause inconvenience or

hardship, eliminate certain educational or economic opportunities, or not comport with the child's preferences.' " Miltiadous v. Tetervak, 686 F. Supp. 2d 544, 549 (E.D. Pa. 2010)(quoting In re Application of Adan, 437 F.3d 381, 395 (3d Cir. 2006)).

**56)**   Clear and convincing evidence is an intermediate standard of proof and is applied in cases where the individual interests at stake are both particularly important and more substantial than mere loss of money. See Cruzan by Cruzan v. Dir., Missouri Dep't of Health, 497 U.S. 261, 282 (1990)(citations omitted).

**57)**   Clear and convincing evidence has been defined as "evidence which 'produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable [the factfinder] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue.'" Id. at 285, n. 11 (quoting In re Jobes, 529 A.2d 434, 441 (N.J. 1987)); See also Model Civ. Jury Instr. 3rd Cir. 1.11 (2024)("Clear and convincing evidence is evidence that produces in your mind a firm belief or conviction that the allegations sought to be proved by the evidence are true. Clear and convincing evidence involves a higher degree of persuasion than is necessary to meet the preponderance of the evidence standard. But it does not require proof beyond a reasonable doubt, the standard applied in criminal cases.").

31

**58)**   A respondent must cite specific evidence of potential harm to the child upon their return. <u>Baxter v. Baxter</u>, 423 F.3d 363, 374 (3d Cir. 2005).

**59)**   "The exception has been held to apply in at least two sets of cases: 'when return of the child puts the child in imminent danger ... e.g., returning the child to a zone of war, famine, or disease ... [and in] cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection.' " <u>Id.</u> at 373 (quoting <u>Friedrich v. Friedrich</u>, 78 F.3d 1060, 1069 (6th Cir. 1996)).

**60)**   "Sporadic or isolated incidents of physical discipline directed at the child, or some limited incidents aimed at persons other than the child, even if witnessed by the child, have not been found to constitute a grave risk." <u>Souratgar v. Lee</u>, 720 F.3d 96, 104 (2d Cir. 2013)(collecting cases).

**61)**   Paternal Grandparents have not demonstrated by clear and convincing evidence that ▮▮▮▮ was physically abused by Father, Mother, or members of the household where they reside.

**62)**   Paternal Grandparents only demonstrated that Father bragged about using physical discipline with ▮▮▮▮ in text messages but have not demonstrated that it actually occurred on a regular basis.

63)   Without any photographs, medical evidence, or expert testimony, the court cannot conclude that ███████ was the victim of child abuse or is at grave risk of physical or psychological abuse moving forward.

64)   Paternal Grandmother's testimony is insufficient.

65)   To the extent that Paternal Grandparents offered evidence that Father physically abused Mother in September 2022 and Mother and Father briefly separated after Paternal Grandparents brought ███████ to the United States, such evidence is concerning, but falls short of the clear and convincing evidence required to keep a child from her habitual residence.

66)   Mother, Maternal Grandmother, and Father denied that such domestic violence occurred.

67)   There is no evidence that Mother reported any alleged abuse by Father to Mexican authorities.

68)   There are no photographs depicting the physical injuries to Mother that Paternal Grandmother said she observed on the video call.

69)   As to the severity of any physical abuse to Mother, Paternal Grandparents have not contacted authorities in Mexico or taken any action regarding ███████, ███████'s sibling and their other grandchild.

70)   ███████ remains in Mother and Father's custody in Mexico.

**71)**   The court cannot conclude that ███████ is at grave risk of physical or psychological harm moving forward based on Paternal Grandmother's testimony about alleged domestic violence.

**72)**   Paternal Grandparents established that Father abused drugs in the past.

**73)**   But the text messages regarding Father's substance abuse use end in September 2022.

**74)**   The court has no evidence of contemporaneous drug use by Father or Mother.

**75)**   Paternal Grandparents have not contacted authorities in Mexico about alleged drug abuse or taken any action regarding ███████, ███████'s sibling and their other grandchild.

**76)**   The court cannot conclude that ███████ is at grave risk of physical or psychological harm moving forward based on evidence of Mother and Father's past drug use.

**77)**   Paternal Grandparents also established that Father struck a security officer at a store in the presence of ███████ after being pepper-sprayed.

**78)**   Paternal Grandparents demonstrated that Father broke a glass door at their lawyers' office after a contentious custody proceeding in Monroe County.

**79)**   But Father's volatility was not directed at ███████ during these incidents.

**80)**   Mother and Father have reconciled and now reside with Maternal Grandmother, Mother's brother, Mother's niece, and ███████, ███████'s sister.

**81)**   None of the evidence presented in support of the grave risk defense calls Mother's protective capacity of her children into question.

**82)**   None of the evidence presented in support of the grave risk defense suggests that Maternal Grandmother or ███████'s uncle would not intervene to protect ███████'s safety.

**83)**   None of the evidence presented in support of the grave risk defense supports a conclusion that Mexican authorities would not intervene to protect ███████ (and ███████) if the circumstances warranted such intervention.

**84)**   Accordingly, Paternal Grandparents have not established by clear and convincing evidence that there is a grave risk of physical or psychological harm to ███████ if she is returned to Mexico.

**85)**   Resolution of this petition is not a child custody determination pursuant to Pennsylvania law or the laws of Mexico. See Hague Convention, art. 19. ("A decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue.").

**86)**   The courts and civil authorities of Tabasco, Mexico are equipped to address issues of child custody, including whether Father's custody of ███████ and her sister ███████ should be limited in any regard.

35

**87)**   Parents' petition for return will thus be granted.

### g.  Costs and Attorneys' Fees

**88)**   ICARA provides: "Any court ordering the return of a child pursuant to an action brought under section 9003 of this title **shall** order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, foster home or other care during the course of proceedings in the action, and transportation costs related to the return of the child, unless the respondent establishes that such order would be clearly inappropriate." 22 U.S.C. § 9007(b)(3)(emphasis added).

**89)**   Petitioner's request for "at least $25,000 in attorney fees and costs" is not supported by documentary evidence that Mother and Father actually incurred those costs.

**90)**   The court will reserve a ruling on costs and legal fees following ██████'s return to Mexico upon the filing of a fee petition with supporting documentation.

### h. Issues with a Return Order

**91)**   From the record, it appears that Father will be arrested on outstanding warrants and incarcerated if he enters the United States.

**92)**   Father also does not have a valid United States passport for reentry into the United States.

93)   From the record, it appears that Paternal Grandparents will be arrested and incarcerated if they enter Mexico based on pending criminal charges in the State of Tabasco.

94)   Mother requires a visa or humanitarian parole to enter the United States to bring ▮▮▮▮ back to Mexico and it does not appear that she has planned to obtain such permission to enter the United States.

95)   Accordingly, the court cannot fashion a specific return order involving the parties with the information available from the record.

96)   The court prefers that ▮▮▮▮ remain with family members in the United States than in the custody of a child protective service agency until the time of her return to Mexico.

97)   Accordingly, the court will temporarily maintain the status quo until an appropriate return order can be issued with a specific date, time, and location of transfer of ▮▮▮▮ from Paternal Grandparents for ▮▮▮▮'s travel back to Mexico.

98)   Until such time, Paternal Grandparents shall not remove ▮▮▮▮ from the jurisdiction of the United States District Court for the Middle District of Pennsylvania nor permit any person acting in concert or participation with them to remove ▮▮▮▮ from this jurisdiction.

**99)**   Parents will be directed to submit a proposed return order within twenty-four (24) hours.

**Conclusion**

For the reasons set forth above, the petition for return of ███████ (Doc. 1) will be granted and her return immediately ordered.  To ensure that ███████'s return is handled in a safe, appropriate manner, petitioners will be ordered to submit a proposed return order within twenty-four (24) hours.

Date: _7/29/24_

**JUDGE JULIA K. MUNLEY**
**United States District Court**

38